# Rocky Mountain RMA
### ADVISORY

September 22, 2016

Richard R. Ward
Lindsay Clayton
Jennifer Golden
U.S. Department of Justice
P.O. Box 683
Washington, D.C. 20044

Re: Investor Victims v. Ronald B. Talmage; Request for Application of Tax Direction No. 137

Dear Mr. Ward, Ms. Clayton and Ms. Golden:

My firm and I have been retained by John Wadsworth on behalf of himself and multiple investor victims to investigate and analyze the financial activities of Ronald B. Talmage ("Talmage") with respect to the use of these investors' money. These investors request that the Internal Revenue Service ("IRS") and US Department of Justice apply Tax Directive No. 137 ("Directive 137") and cede their federal tax claim against Talmage, specifically the RiverCliff property in Oregon, for the benefit of the investor victims who are owed more than $31.5 million. Based on our analysis and investigation, we believe the requirements of Directive 137 are fully met as set forth in this report. First, the tax claim on the Oregon property and the investor victim's claim arise from the same transactions, as described below. Second, the Oregon property purchase and improvements are traceable to the fraud or wrongdoing, sourced from investor money raised from Talmage's scheme.

By way of background, my firm and I have investigated numerous Ponzi schemes and other fraudulent schemes. I have served as court-appointed receiver, bankruptcy trustee and accountant over various entities found to have been Ponzi schemes, including some of the largest schemes in Utah. My involvement in these cases came about through enforcement actions brought by the SEC or motions for appointment of a bankruptcy trustee by the US Trustee's office or creditors. I am the Senior Managing Member of Rocky Mountain Advisory, LLC, a forensic accounting firm. Prior to joining RMA, I was the Managing Director of Advisory Services for the Salt Lake City office of PricewaterhouseCoopers LLP (1988 – 2010) and a manager in the litigation and bankruptcy practice in the Salt Lake City office of KPMG (1984-1988). I hold Master's and Bachelor's degrees in Accounting from Brigham Young University (1984-85). I am a Certified Public Accountant, Certified Insolvency and Restructuring Advisor, and a Certified Fraud Examiner.

## Executive Summary

Based on our analysis of financial records, business records and interviews with investor John Wadsworth, we have determined that the scheme carried out by Talmage exhibited the characteristics of a Ponzi scheme. While evidence suggests Talmage's scheme exhibited the

EXHIBIT __A__
PAGE __1__ OF __10__

Richard R. Ward
Lindsay Clayton
Jennifer Golden
September 22, 2016
Page 2

characteristics of a Ponzi scheme as early as the 1990s, I have found evidence that Ponzi scheme characteristics were being exhibited in the Talmage scheme by at least January 2002. In my experience and based on accepted accounting literature, I have found that Ponzi schemes generally share certain characteristics:

1. The business activity is dependent on outside investor money.[1]
2. The investor money is not used according to the stated purpose. Some of the investor money is used to pay returns to earlier investors.[2]
3. The business enterprise lacks profits sufficient to provide the promised return, and, therefore, is dependent on an ever-increasing supply of investor money.[3]
4. High rates of return or other inducements relative to the promoted investment risk.
5. The business experiences increasing insolvency.[4]

Our analysis of the bank accounts utilized by Talmage from 2002 to 2016 shows that Talmage's scheme was completely dependent on new investor money and most closely resembles enterprises that I would call "pure" Ponzi schemes (*see* Exhibit 1), meaning that little if any money came from sources other than investors. Many of the schemes I have investigated, which have been proven to be Ponzi schemes, have elements of legitimacy or are conducted within an otherwise legitimate business. Some have involved commercial real estate, insurance businesses, or money lending businesses, for example. The legitimate business is often a money losing front to entice investors with a façade of legitimacy.[5] However, we have seen little, if any, actual business activity in the Talmage scheme. It appears the entire scheme was based on misrepresentations to investors of Talmage's role as financial advisor in managing investor money.

The Ninth Circuit has stated: "Distributing funds to earlier investors from the receipt of monies from later investors is the hallmark of Ponzi schemes."[6] As Exhibit 1 shows, Talmage raised nearly $55.7 million from investors from 2002 to 2015. More than $26 million was paid to earlier investors. The only significant source of funds was investor money. As Talmage had little, if any, other source of profits or funding, the business became dependent on an increasing

---

[1] Assets Protection, *"Investigating the Ponzi Scheme,"* Alan V. Funk, 1991. AICPA Consulting Services Practice Aid 97-1, Fraud Investigations In Litigation And Dispute Resolution Services, Pages 75, 100-31.
[2] *Ibid.*
[3] *Ibid.*
[4] Ponzi Schemes in Bankruptcy, American Bankruptcy Institute Commercial Fraud Task Force Committee, Vol. 4, Num. 4, July 2007, Patrick M. O'Keefe, Russell D. Long, Michael S. McElwee.
[5] Association of Insolvency & Restructuring Advisors, Journal, August/September 2010, *Ponzi Schemes: Part 2*, Professor Jack F. Williams, CIRA/CDBV, Georgia State University.
[6] *Hayes v. Palm Seedlings Partners-A, et al,* (In re Agric. Research & Tech. Grp., Inc.), 916 F.2d 528, 536 (9th Cir. 1990).

Richard R. Ward
Lindsay Clayton
Jennifer Golden
September 22, 2016
Page 3

supply of investor money. The scheme collapsed beginning around 2014, when investors began demanding a return of their investments from Talmage and an investigation ensued.

Our analysis included bank statements for 16 bank accounts utilized by Talmage over the period 2002 through 2016. Below is a summary of the bank accounts analyzed:

| Bank | Account Name | Account No. |
|---|---|---|
| CITIC KA WAH BANK | World-Wide Investment Services Limited | xxxxxxxx1500 |
| CITIC KA WAH BANK | World-Wide Investment Services Limited | xxxxxxxx1501 |
| CITIC KA WAH BANK | World-Wide Investment Services Limited | xxxxxxxx1502 |
| CITIC KA WAH BANK | World-Wide Investment Services Limited | xxxxxxxx1504 |
| CITIC KA WAH BANK | World-Wide Investment Services Limited | xxxxxxxx5501 |
| CITIC KA WAH BANK | World-Wide Investment Services Limited | xxxxxxxx1528 |
| CITIC KA WAH BANK | Heng Cheong Pacific Limited | xxxxxxxx5300 |
| CITIC KA WAH BANK | Heng Cheong Pacific Limited | xxxxxxxx5301 |
| CITIC KA WAH BANK | Heng Cheong Pacific Limited | xxxxxxxx5302 |
| CITIC KA WAH BANK | New Century Properties Limited | xxxxxxxx3100 |
| CITIC KA WAH BANK | New Century Properties Limited | xxxxxxxx3101 |
| CITIC KA WAH BANK | New Century Properties Limited | xxxxxxxx3102 |
| CITIC KA WAH BANK | WWIS Limited | xxxxxxxx6500 |
| CITIC KA WAH BANK | WWIS Limited | xxxxxxxx6600 |
| CITIC KA WAH BANK | WWIS Limited | xxxxxxxx6601 |
| CITIC KA WAH BANK | WWIS Limited | xxxxxxxx6602 |

In summary, based on our analysis and interviews, between 2002 and 2015, nearly $55.7 million in investor deposits were received into Talmage-controlled accounts. Other sources of money were minor transfers and bank interest income on account balance. From the $55.8 million of total sources of cash, Talmage paid the following (all amounts in $US):

- More than $22.9 million to post-2002 investors.
- Approximately $3.4 million to payoff pre-2002 investors.
- Over $11.1 million to purchase, develop and maintain the RiverCliff property in Oregon (the property at issue related to this Directive 137 request).
- More than $915,000 to Commence for their nominee and secretarial services.
- Approximately $1 million to Ms. Liu Chen for her nominee services.
- More than $1.5 million to Kory Talmage, Talmage's son. Talmage hired his son Kory as an employee, primarily responsible for managing the company IT systems. Kory Talmage has cooperated with the investigation of his father's scheme. Talmage paid another approximately $718,000 for other employee expenses.

Richard R. Ward
Lindsay Clayton
Jennifer Golden
September 22, 2016
Page 4

- More than $1.7 million to Talmage's personal dog trainer and breeder (averaging $114,000 per year). Talmage was an avid participant in Irish Setter dog shows, and regularly participated in national Irish Setter field trials.
- More than $941,000 to his own personal bank accounts.
- More than $6 million to pay his own personal expenses.
- Approximately $5.4 million to American Express. Of this amount Talmage used approximately $3 million to pay his own personal expenses through American Express. Talmage maintained an American Express account in his own name, and issued American Express cards on his account to some investors.

A graphic summary of the above flow of funds is attached hereto as Exhibit 2.

As shown on Exhibit 3, Talmage received nearly $55.4 million from investor victims, returned nearly $23.9 million to the same victims, and diverted more than $31.5 million.[7]

Based on Directive 137, the investor victims of the Talmage scheme request that the United States cede its federal tax claim to the investor victims' claims who have lost more than $31.5 million (*see* Exhibit 3), based purely on cash invested less cash received. The RiverCliff property in Oregon being foreclosed upon the United States arises from the same transactions as the scheme described. The tax liability arises from transfers of money from Talmage-controlled accounts to the RiverCliff property, the source of which was investor money. The money used to purchase and improve the RiverCliff property came from investor funds. From 2002 to 2016, more than $11.1 million was used to develop and maintain the RiverCliff property.

## Ponzi Scheme Background

The following background is based on information and documents obtained from John Wadsworth as well as bank and other financial records.

In January 1979, Talmage began working in real estate development and investment advisory services in Japan. Ronald B. Talmage was a Director at the investment bank N.M. Rothschild & Sons and a Director of Rothschild Properties Ltd. in Tokyo. After leaving the employment of Rothschild Bank in the late 1980's, Talmage setup various British Virgin Island International Business Companies using a Hong Kong-based secretarial company named Commence Company Inc. Among the companies Talmage formed was a company named New Century

---

[7] As shown on Exhibit 1, more than $3.4 million was paid to pre-2002 investors, which investors have been paid in full. Exhibit 1 shows post-2002 investors were returned $22.9 million. Exhibit 3 shows a total returned of $23.9 million. The difference is included in payments to American Express as certain investors were issued American Express cards by Talmage.

Richard R. Ward
Lindsay Clayton
Jennifer Golden
September 22, 2016
Page 5

Properties Limited ("NCPL" incorporated February 28, 1991) and Trans Pacific Partners Limited ("TPP"), incorporated January 5, 1998. NCPL was the parent company of the various subsidiaries (*see* Exhibit 4). Talmage was the sole shareholder of NCPL (*see* Exhibit 5). Talmage acted as bank signatory for NCPL (*see* Exhibit 6). Talmage also paid Commence to act as bank signatory and Nominee Corporate Director for NCPL and paid Commence a fee to perform bank transfers (*see* Exhibit 7).

Beginning as early as 1991, Talmage solicited investments from Japanese and US investors, phase 1 of Talmage's scheme. Investor funds were funneled through NCPL and its various subsidiaries. Investor funds were used to pay for Talmage's personal expenses (*see* Exhibit 8) and to make payments to earlier investors, a hallmark of Ponzi schemes.

In November of 1997, Talmage purchased property named the RiverCliff property ("RiverCliff") in Corbett, Oregon for $903,000. The RiverCliff property consists of approximately 47.73 acres located in the protected Columbia River Gorge National Scenic Area overlooking the Columbia River Gorge (Multnomah County Property ID Number R322308). $519,033 of the funds used to purchase the RiverCliff property were wire transferred from the NCPL bank account in Hong Kong (*see* Exhibit 22 Paragraph 76). Talmage retained Schommer & Sons, a prominent Portland construction firm, to renovate and do extensive development of the RiverCliff property. Between 1998 and 2007 Schommer & Sons was paid approximately $12,500,000 for their services to develop the RiverCliff property (*see* Exhibit 22 Paragraph 87). The vast majority of the approximately $12,500,000 paid to Schommer & Sons was wire transferred from the NCPL bank account in Hong Kong. The funds funneled through the NCPL bank account and sent to Oregon were funds from the victims of the scheme operated by Talmage between 1991 and 2016. Over $11.1 million of investor funds can be traced directly to the RiverCliff property in Oregon over the period 2002 to 2016 (*see* Exhibit 1). On June 17, 2005, NCPL formed a wholly owned subsidiary named RiverCliff Farm, Inc., an Oregon corporation ("RFI"), and transferred ownership of the RiverCliff property to RFI.

On March 18, 2002, Talmage instructed Commence to change the name of TPP to World-Wide Investment Services Limited ("World-Wide" or "WWIS (BVI)") (*see* Exhibit 9). Talmage instructed Commence to open bank accounts for World-Wide and Talmage was the sole director of World-Wide (*see* Exhibit 9). Talmage also instructed Commence to change the name of TPP Limited to WWIS Limited ("WWIS" or "WWIS (HK)").

In 2002 Talmage began a second phase of the scheme. Utilizing the newly re-named company World-Wide Investment Services Limited, Talmage began meeting with and soliciting investments from Japanese and US investors.

Richard R. Ward
Lindsay Clayton
Jennifer Golden
September 22, 2016
Page 6

Talmage traveled to Tokyo Japan many times per year to meet with potential investors in person. Most meetings took place in various hotels located in Tokyo (*see* Exhibit 10). Talmage always stressed how important confidentiality was for him. According to John Wadsworth, Talmage told investors that because of his background with Rothschild Bank, he could be trusted and his word was a promise and a guarantee (*see* also Exhibit 10). Based on John Wadsworth and information gathered by him, Talmage repeatedly emphasized how important confidentiality was to him. Talmage insisted that any written communication be only made through communication channels which he controlled. This gave Talmage extensive control over record preservation.

Talmage invited investors to Oregon to spend time at RiverCliff. Talmage represented to investors that the RiverCliff property was his estate. Talmage used RiverCliff to show investors how successful he was and to build confidence in the investment scheme he was promoting.

Japanese culture dictates that business relationships begin through personal introductions. Most new investors came from introductions obtained from existing investors. Talmage used promotional material, which described World-Wide as having been formed in 1986 and having capital stock of $100,000,000. (*see* Exhibit 11 and accompanying translation).

The promotional material reported World-Wide as having done $720 million in M&A transactions, $4.1 billion in structured finance transactions and currently managing an investment fund with assets of $2.4 billion. These representations have proven to be false.

Talmage told investors that since leaving his role as a private banker at Rothschild Bank he had established a long-term track record as a successful financial advisor managing other people's money. Talmage represented that in his capacity as trustee, he managed and cared for the assets of ultra-high net worth clients in Japan, China, Hong Kong, Malaysia and Taiwan.

In particular Talmage represented that he was the sole Trustee of over $400 Million of funds from the estate of a Mrs. Chen, who lived in Taiwan (Liu Hsiu Chen aka Sho Tsun). Talmage represented that he was a Regent on the board of a Foundation established by the Jinnai family (founders of Promise Co. Ltd. in Japan). Talmage said the Foundation had a fund, which was managed by Jardine Matheson, a large British conglomerate. Talmage said the fund had a principal guarantee provided by the fund manager Jardine Matheson (Single A credit rating) with a credit enhancement or "Credit Wrap" provided by AXA, a French multinational insurance firm, making the fund "doubly insured". Talmage said the fund had US$2.5 Billion in assets, was widely diversified across multiple asset classes and was backed by Jardine Matheson Holdings. Talmage said the fund was very private, and inaccessible to the public, but since he was on the Board, he had the right to co-invest along with the Foundation in the fund, and thus could provide investors with a secure yield, backed by the guarantees of both Jardine Matheson and AXA. In addition, Talmage represented that because of his service on the Board, the Foundation

Richard R. Ward
Lindsay Clayton
Jennifer Golden
September 22, 2016
Page 7

provided him with a "minimum return guarantee", which he would in turn provide to investors. Talmage represented that the minimum return guarantee was 6% to 10% annually.

Talmage told investors that the minimum investment size was US$1 Million. Talmage gave investors a "Trust Agreement" (*see* Exhibit 12) and represented that he and the entities he controlled in Hong Kong would act as trustees to hold and manage investor assets in trust, the same way that the Rothschild Bank acted as Trustee for client assets. Talmage instructed investors to wire transfer their funds to his various bank accounts in Hong Kong. In the early stages of the scheme, Talmage told investors that because of the "third party principal guarantee" their funds would be locked up for one year. Later, Talmage extended the lockup period to three years, and then later further extended the lockup period to five to seven years depending on whom he was talking to.

Talmage represented to investors that after receiving funds, he would automatically remit the funds to Jardine Matheson on the first day of each month. Talmage emphasized the benefits of "compounding" and encouraged investors to "roll over" yields, which he represented would compound quarterly. Talmage represented that the fiscal year of the fund ended on March 31st, at which time he would attend an annual Board Meeting where the gross annual yield of the fund and detailed fund allocations would be reported by Jardine Matheson. Each year, Talmage would provide a summary of the supposed yield and investment allocation report from the Board Meeting (*see* Exhibit 13) and periodic yield reports to investors (*see* Exhibit 14).

In 2004, Commence formed another company named Heng Cheong Pacific Limited ("HCPL" incorporated April 26, 2004, *see* Exhibit 15). After forming HCPL, Talmage would provide investors with various fund prospectuses (*see* Exhibit 16) and began instructing investors to wire transfer their funds to HCPL. Talmage told investors that HCPL was a "master feeder fund" for the main principal guaranteed fund managed by Jardine Matheson. Talmage also represented that specialized funds could be created if investors had specific investment allocation recommendations. Additionally, Talmage represented that Mrs. Chen was also investing in these funds.

Talmage told investors to submit any withdrawal requests before the end of the calendar year, and the withdrawals would be processed in April of the following year—subject to the maturation of the respective "principal guarantee" term. Up until approximately 2012 most withdrawal requests from investors were paid. The banking records show that payments to investors were made consistent with a Ponzi scheme, where investor deposits from one investor were used to pay withdrawal payments to another investor. Payment instructions were issued directly by Talmage to Commence, primarily via email and fax (*see* Exhibit 17).

Richard R. Ward
Lindsay Clayton
Jennifer Golden
September 22, 2016
Page 8

In 2012 several investors made large withdrawal and payment requests. These requests exceeded the amount of new money that was coming in. Talmage began giving a series of increasingly elaborate excuses as to why the liquidations and payments would be delayed, and why he was unable to travel to Japan to meet with investors. In 2013, Talmage appointed Mrs. Chen (Liu Hsiu Chen or "Sho Tsun") as the sole shareholder of NCPL, and began issuing payment instructions to Commence in the name of Mrs. Chen (*see* Exhibit 18).

In 2014, Talmage told investors that fund liquidations were being delayed because a US$300 million agricultural processing facility in South East Asia was being sold by the fund and the size of the transaction was causing the delay. Talmage assured investors the transaction would close prior to the end of the fiscal year, and he would make investors payments (*see* Exhibit 19). In 2015, Talmage began claiming that he was sick and unable to travel or meet with anyone and later claimed that he had been diagnosed with cancer.

In 2015, American Express cancelled Talmage's account due to non-payment (*see* Exhibit 20). Based on our analysis of cash flow, it appears Talmage was experiencing cash flow shortages due to a lack of new investor money.

In early 2016, after four years of excuses, Talmage became completely unreachable, even to his own family members. In April 2016, Kory Talmage and John Wadsworth met with other investors in Japan and told them of the inability to establish contact with Talmage. After discussing the situation with other investors the decision was made to go to Taiwan to attempt to meet with Mrs. Chen, who was listed as Chairman of NCPL.

The purpose of the meeting was to see if Mrs. Chen knew if the excuses Talmage was giving were true and to determine the real status of investor funds. Kory Talmage and John Wadsworth met with Mrs. Chen in Taipei Taiwan. Mrs. Chen lived in a dilapidated apartment in Taipei with her ailing mother (*see* Exhibit 21). Mrs. Chen said she had lived in the apartment for 40 years. Mrs. Chen said she had no wealth other than what Talmage had paid her, and that she knew nothing of NCPL or any of the subsidiary companies because Talmage handled all such matters. Mrs. Chen could not speak English, didn't own a computer and said she had never written an email in her life. Mrs. Chen signed a Letter of Authorization permitting Kory Talmage and John Wadsworth to access all records associated with the Talmage group of companies.

Kory Talmage and John Wadsworth traveled from Taiwan to Hong Kong, went to the offices of Commence, presented the Letter of Authorization and requested access to the records. Commence initially would not provide access to the records, saying that they needed to contact Talmage first and receive authorization. After being unable to establish contact with Talmage for two days, Commence agreed to provide access to the records. Banking, business and financial records were provided for analysis.

While in Hong Kong in April 2016, Kory Talmage was contacted by his father, Talmage. Talmage told Kory Talmage and John Wadsworth that he had been inducted as the new Chairman of the Foundation Board by Mr. Ryoichi Jinnai. Talmage said Mr. Ryoichi Jinnai was the patriarch of the Jinnai family and the majority investor in the Foundation fund. He reported the supposed yield performance from the fund for the 2015-16 fiscal year. He said he decided he wanted Kory Talmage and John Wadsworth to be prepared to act as his assistants in his role as Chairman. He said the Board had allocated $300 Million for charitable donations in the upcoming fiscal year, and that now in his role as newly appointed Chairman he was in a position to move along the delayed liquidations of investor funds, he just needed more time.

In May 2016, Kory Talmage and John Wadsworth traveled to Japan and again met with investors in Japan to report the findings in Hong Kong and Taiwan. Attorneys and other professionals in Hong Kong had been determining what legal action in Hong Kong and the British Virgin Islands would be most effective to recover investor funds. Unfortunately, an asset search showed that there were no recoverable assets in either jurisdiction. Legal counsel was retained in Japan and the asset search was expanded to the United States. Both Mrs. Chen and the investors in Japan instructed Kory Talmage and John Wadsworth to travel to the US and take all actions necessary to recover investor funds. In June 2016, Kory Talmage and John Wadsworth traveled to Portland Oregon to determine the status of RiverCliff in Oregon.

In July 2016, Kory Talmage and John Wadsworth traveled to Utah to visit what had been a former residence of Talmage. According to John Wadsworth, while at what they thought was Talmage's abandoned residence, Talmage drove up, exited his vehicle with a gun in his hand and threatened Kory Talmage and John Wadsworth. Talmage's current whereabouts are unknown.

Mark Howard, of Strong & Hanni Law Firm, was retained in July 2016. Mr. Howard was able to determine that the United States had a pending legal action on the RiverCliff property in Oregon (*see* Exhibit 22). The United States' legal action against the RiverCliff property in Oregon property was based on a collection action stemming from a prior US Tax Court ruling wherein Talmage was determined to have unreported imputed income from wire transfers sent from the NCPL bank account in Hong Kong to Oregon. Based on our analysis of the bank records, the source of the money wire transferred from NCPL to Oregon were funds which originated from the victim investors.

### Conclusion and Request for Application of Directive 137

As outlined above, we believe our investigation of the cash flows and operations of Talmage's scheme show that Talmage's scheme was operating with all the characteristics of a Ponzi scheme


EXHIBIT A
PAGE 9 OF 10

Richard R. Ward
Lindsay Clayton
Jennifer Golden
September 22, 2016
Page 10

since at least 2002, but even as early as the 1990s. The money used to purchase, develop and maintain the RiverCliff property originated from victim investors.

Accordingly, consistent with the Department of Justice Tax Directive No. 137, these traceable RiverCliff assets should be ceded to the defrauded victims rather than in payment of the tax claims. The investor victims respectfully request that the IRS and US Department of Justice cede their federal tax claim against Talmage, specifically the RiverCliff property in Oregon, for the benefit of the investor victims who are owed more than $31.5 million.

Please let me know if you have any questions about my analysis, or if there is any other information that you need in order to process this request.

Sincerely,

*[signature]*

Gil A. Miller, CPA CFE CIRA

Enclosures

cc:   John H. Curtis w/encl.
      Mark Howard w/encl.
      John Wadsworth w/encl.

EXHIBIT   A
PAGE  10  OF  10